UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TYWANA M. WIGGINS,

      Plaintiff,                    Case No. 14-cv-10452
                                    Hon. Matthew F. Leitman

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF #15) AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF #18)

Plaintiff Tywana M. Wiggins ("Plaintiff") seeks judicial review of the decision by Defendant Commissioner of Social Security (the "Commissioner") to deny her application for Social Security Disability Insurance Benefits. (*See* Complaint, ECF #1.) Before the Court are summary judgment motions by both parties. (*See* Plaintiff's Motion, ECF #15; *see also* Commissioner's Motion, ECF #18.) For the reasons set forth below, the Court **GRANTS** the Commissioner's Motion (ECF #18) and **DENIES** Plaintiff's Motion (ECF #15).

## PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on April 17, 2009. (*See* ECF #11-5 at 241-49, Pg. ID 283-91.) Plaintiff alleged that she had

1

been unable to work since March 20, 2009.  (*See* ECF #11-6 at 271, Pg. ID 314.)

The Commissioner initially denied Plaintiff's application on July 16, 2009. (*See* ECF #11-4 at 142, Pg. ID 183.)  Thereafter, Plaintiff filed a written request for an administrative hearing.  (*See id.* at 146, Pg. ID 187.)  A hearing was held on July 14, 2010 (the "First Hearing"), before Administrative Law Judge James M. Mitchell ("ALJ Mitchell").  (*See* ECF #11-2 at 75-117, Pg. ID 114-56.)  On October 21, 2010, ALJ Mitchell issued a decision finding that Plaintiff was "not disabled" under the Social Security Act (the "Act").  (*See* ECF #11-3 at 119-34, Pg. ID 159-174.)  Plaintiff administratively appealed the Commissioner's decision. (*See* ECF #11-4 at 199, Pg. ID 240.)  On May 24, 2012, the Social Security Administration's Appeals Council ("Appeals Council") remanded the matter to an administrative law judge to obtain additional evidence and further consider the record.  (*See* ECF #11-3 at 135-39, Pg. ID 175-79.)

A second hearing was held on October 1, 2012 (the "Second Hearing"), before Administrative Law Judge Donald G. D'Amato (the "ALJ").  (*See* ECF #11-2 at 54-74, Pg. ID 93-113.)  On November 8, 2012, the ALJ determined that Plaintiff was "not disabled" under the Act, and he denied Plaintiff's application for benefits.  (*See* the "ALJ's Decision," ECF #11-2 at 20-53, Pg. ID 59-92.)

Plaintiff administratively appealed the ALJ's Decision (*see* ECF #11-2 at 14-15, Pg. ID 53-54), and the Appeals Council denied her appeal on December 3, 2013 (*see id.* at 1-6, Pg. ID 40-45). Plaintiff then filed this action. (*See* ECF #1.) The parties have each now filed cross-motions for summary judgment.

## **APPLICABLE LAW**

### A.    **Framework for Social Security Determinations**

"The Act entitles to benefits payments certain claimants who, by virtue of a medically determinable physical or mental impairment of at least a year's expected duration, cannot engage in 'substantial gainful activity.'" *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) (en banc) (quoting 42 U.S.C. § 423(d)(1)(A)). A claimant qualifies as disabled "if she cannot, in light of her age, education, and work experience, 'engage in any other kind of substantial gainful work which exists in the national economy.'" *Id.* (quoting 42 U.S.C. § 423(d)(2)(A)).

Under the authority of the Act, the Social Security Administration (the "SSA") has established a five-step sequential evaluation process for determining whether an individual is disabled. *See* 20 C.F.R. § 404.1520(a)(4). The five steps are as follows:

> In step one, the SSA identifies claimants who "are doing substantial gainful activity" and concludes that these claimants are not disabled. [20 C.F.R.] § 404.1520(a)(4)(i). If claimants get past this step, the SSA

3

at step two considers the "medical severity" of claimants' impairments, particularly whether such impairments have lasted or will last for at least twelve months. *Id.* § 404.1520(a)(4)(ii). Claimants with impairments of insufficient duration are not disabled. *See id.* Those with impairments that have lasted or will last at least twelve months proceed to step three.

At step three, the SSA examines the severity of claimants' impairments but with a view not solely to their duration but also to the degree of affliction imposed. *Id.* § 404.1520(a)(4)(iii). Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the SSA's special list of impairments, or that is at least equal in severity to those listed. *Id.* § 404.1520(a)(4)(iii), (d). The list identifies and defines impairments that are of sufficient severity as to prevent any gainful activity. *See Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A person with such an impairment or an equivalent, consequently, necessarily satisfies the statutory definition of disability. For such claimants, the process ends at step three. Claimants with lesser impairments proceed to step four.

In the fourth step, the SSA evaluates claimant's "residual functional capacity," defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). Claimants whose residual functional capacity permits them to perform their "past relevant work" are not disabled. *Id.* § 404.1520(a)(4)(iv), (f). "Past relevant work" is defined as work claimants have done within the past fifteen years that is "substantial gainful activity" and that lasted long enough for the claimant to learn to do it. *Id.* § 404.1560(b)(1). Claimants who can still do their past relevant work are not disabled. Those who cannot do their past relevant work proceed to the fifth step, in which the SSA determines whether claimants, in light of their residual functional capacity, age, education, and work experience, can perform "substantial gainful activity" other than their past

4

> relevant work. *See id.* § 404.1520(a)(4)(v), (g)(1).
> Claimants who can perform such work are not disabled.
> *See id.;* § 404.1560(c)(1).

*Combs,* 459 F.3d at 642–43. "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). If the analysis reaches the fifth step, as happened here, the burden transfers to the Commissioner. *See Combs*, 459 F.3d at 643. At that point, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her [residual functional capacity ("RFC")] and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see also* 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

## B.    This Court's Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.,* 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

5

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). If substantial evidence supports the Commissioner's decision, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip*, 25 F.3d at 286 (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes ... a zone of choice within which the decisionmakers can go either way, without interference by the courts") (internal quotation marks omitted).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512–13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.,* 974 F.2d 680, 683 (6th Cir. 1992). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

6

## RELEVANT FACTUAL BACKGROUND

**A.    Plaintiff's Testimony**

At the Second Hearing before the ALJ, Plaintiff identified multiple medical conditions that affect her.[1]   Specifically, Plaintiff testified that she suffers from bilateral carpal tunnel syndrome, lower back pain, neck pain, cysts on her wrists, asthma, obstructive sleep apnea, depression, headaches, kidney stones, and fibromyalgia.  (*See* ECF #11-2 at 58, Pg. ID 97.)

Plaintiff asserted that her neck, legs, arms, and back bothered her the most. (*See id.* at 59, Pg. ID 98.)   Plaintiff testified that her arms "burn … ache, and throb."  (*Id.* at 61, Pg. ID 100.)  Plaintiff stated that her arms "feel … really tired and exhausted … like they want to just fall off."  (*Id.*)   Plaintiff said that she experiences "numbing, tingling, and burning" in her hands.  (*Id.*)  Plaintiff testified that the burning sensation in her hands and arms is intermittent, and she experiences it three or four times per week.  (*See id.* at 68, Pg. ID 107.)  Plaintiff also stated that she experiences swelling, aching, and throbbing in her neck and back.  (*See id.*)

---

[1]   The Court has considered Plaintiff's testimony from both the First Hearing and Second Hearing.   Because Plaintiff's testimony at the hearings was generally consistent, this Opinion describes her testimony at the First Hearing only to the extent that it is relevant and not redundant.

Plaintiff testified that her physical functioning is limited due to her pain. (*See id.* at 61, Pg. ID 100.)  Specifically, she stated that after she sits for 15-20 minutes, her legs "feel exhausted," and she has "to get up and just stand up and move around for a minute." (*Id.* at 60, Pg. ID 99.)  Similarly, Plaintiff stated that she could stand for "about 15 or 20 minutes" at a time. (*Id.*)  Plaintiff also testified that she could walk less than a block without needing to rest. (*Id.*)  Plaintiff asserted that she could only lift less than 10 pounds. (*Id.*)  Plaintiff asserted that on some days it is difficult to turn her head from side-to-side or up-and-down. (*See id.* at 68, Pg. ID 107.)

Plaintiff testified that she lives by herself. (*See id.* at 60, Pg. ID 99.) Plaintiff described both "good days" and "bad days."  Plaintiff stated that on a good day, she typically gets out of bed around noon, eats some cereal, uses the restroom, and lies back down. (*See id.* at 61-62, Pg. ID 100-01.)  Plaintiff testified that on a good day she "might go by [her] mother's house," approximately five-to-seven minutes away. (*Id.* at 62, Pg. ID 101.)  Plaintiff stated that on a bad day, she "wake[s] up … already in pain, burning … from the top her [her] head to the bottom of [her] feet … already feeling exhausted." (*Id.* at 66, Pg. ID 105.) Plaintiff said that on bad days she "stay[s] at home and stay[s] in bed all day." (*Id.*)  Plaintiff testified that she has approximately two bad days per week. (*See id.*)

8

Plaintiff asserted that she does not do any housework. (*See id.* at 65, Pg. ID 104.) Plaintiff stated that she can make herself a sandwich or "warm something up in the microwave." (*Id.*) Plaintiff said that she either shops for groceries with her mother, or her mother shops for her. (*See id.*) Plaintiff testified that she goes to church at least once or twice per month but that she does not go more frequently because of her pain. (*See id.* at 66-67, Pg. ID 105-06.)

Plaintiff testified that she takes Cymbalta, Nuerontin, and Naproxen for pain management. (*See id.*) However, Plaintiff stated that even after she takes these medications, her pain level is still 6 or 7 out of 10. Plaintiff testified that her medications make her feel "really nauseous ... exhausted, [and] really fatigued." (*Id.* at 63, Pg. ID 102.)

## B.    Plaintiff's Medical Records[2]

Dr. Arthur Siddiqui ("Dr. Siddiqui") was Plaintiff's primary care physician at the onset of her alleged disability in March 2009. (*See id.* at 94, Pg. ID 133.) Dr. Siddiqui's treatment records appear to indicate that Plaintiff complained of severe pain in both wrists, neck, and both shoulders at that time. (*See* ECF #11-7 at 372-73, Pg. ID 415-16.) Dr. Siddiqui ordered a series of tests, advised Plaintiff to see a neurosurgeon, and suggested that Plaintiff refrain from work. (*See id.*)

---

[2]   The Court has conducted an independent review of the voluminous medical records that Plaintiff submitted to the SSA. The following is not a complete summary of Plaintiff's lengthy medical history; rather, this Opinion discusses only the medical records most relevant to Plaintiff's claims in this action.

Shortly thereafter, Plaintiff underwent electromyography ("EMG") and magnetic resonance imaging ("MRI") studies. An EMG study dated March 26, 2009 (the "2009 EMG"), indicated "mild C6-C7 radiculopathy involving bilateral upper extremity" and "mild sensory carpal tunnel syndrome at both wrists." (*Id.* at 376, Pg. ID 420.) An MRI dated March 31, 2009 (the "March 2009 MRI"), indicated congenital fusion of the C3 and C4 vertebral bodies and disc/osteophyte protrusions in the anterior spinal canal from C4 to C7. (*See id.* at 390, Pg. ID 434.)

Plaintiff then saw two hand surgeons, Dr. David Hing ("Dr. Hing") and Dr. Michael Fitzsimmons ("Dr. Fitzsimmons"). Dr. Hing reviewed the 2009 EMG and noted that it showed improvement relative to a similar test performed on Plaintiff in 2002. (*See id.* at 364, Pg. ID 408.) Dr. Fitzsimmons concluded that the March 2009 MRI images of Plaintiff's wrist were "essentially normal," and he did not "see any significant pathology" for her symptoms. (*Id.* at 427, Pg. ID 471.)

On May 7, 2009, Plaintiff saw Dr. Ed Washabaugh ("Dr. Washabaugh"), a pain specialist. Plaintiff reported neck, back, leg, and hand pain. (*See id.* at 479, Pg. ID 524.) Dr. Washabaugh performed a physical examination and found "negative Hoffmann's signs." (*Id.* at 480, Pg. ID 525.) Dr. Washabaugh also observed that Plaintiff "is able to get from a seated to a standing position." (*Id.*) Dr. Washabaugh recommended that Plaintiff see a neurosurgeon. (*Id.*)

Plaintiff visited Dr. Martin Buckingham ("Dr. Buckingham"), a neurologist, on May 18 and June 2, 2009.  Dr. Buckingham reviewed images of Plaintiff's spine from the March 2009 MRI and commented that the findings were "remarkable" and "quite impressive."  (*Id.* at 443, Pg. ID 487.)  However, Dr. Buckingham also noted that on physical examination, Plaintiff had "excellent power over her arm abductors, forearm flexors, triceps, wrist extensors, finger extensors, and hand grasps."  (*Id.*)  Further, Dr. Buckingham observed that Plaintiff had normal gait and "no overt signs of myelopathy."  (*Id.*)  Dr. Buckingham recommended physical therapy.  (*See id.* at 557, Pg. ID 602.)

Plaintiff attended several sessions of physical therapy in June 2009.  (*See* ECF #11-8 at 464, Pg. ID 509.)  The physical therapist observed that Plaintiff's range of motion in her cervical spine was within normal limits, and Plaintiff had strength of at least 4+/5 in all areas tested: her cervical area, side, shoulder, upper extremities, lower arms, and grip.  (*See id.*)

Plaintiff then returned to Dr. Siddiqui.  (*See* ECF #11-8 at 468, Pg. ID 513.) Dr. Siddiqui reviewed a June 9, 2009, MRI (the "June 2009 MRI"), which showed that Plaintiff had "mild lower lumbar degenerative changes and disc bulging, without significant stenosis of the lumbar spinal canal."  (ECF #11-8 at 459, Pg. ID 504.)  Dr. Siddiqui told Plaintiff "there is no way she can go to work," and he "strongly recommended that [Plaintiff] should apply for Social Security."  (ECF

11

#11-8 at 468, Pg. ID 513.)   At a subsequent appointment, on September 29, 2009, Dr. Siddiqui noted that "[t]here is no way this patient can sit down for more than ½ hour in one place because of lower back pain.  Walking and bending is out of the question…. I don't know what she can do, her activities are so limited, she is practically home bound."  (*Id.* at 513, Pg. ID 558.)  Dr. Siddiqui again advised that Plaintiff "should apply for Social Security."  (*Id.*)

Plaintiff saw several specialists and an emergency room physician over the following year.  In May 2010, Plaintiff returned to Dr. Fitzsimmons regarding mild pain and numbness in her left hand.  (*See id.* at 523, Pg. ID 568.)  Dr. Fitzsimmons determined that although Plaintiff had "reasonably good range of motion at the wrist," her reported symptoms were "consistent with worsening carpal tunnel syndrome."  (*Id.*)  Dr. Fitzsimmons offered steroid injections, which Plaintiff declined.  (*See id.*)  On June 12, 2010, Plaintiff reported to the emergency room complaining of neck pain, but the doctor found no tenderness, swelling, or limitation of range of motion.  (*Id.* at 529, Pg. ID 574.)

On June 29, 2010, Plaintiff returned to Dr. Buckingham complaining of "recurrent neck pain."  (*Id.* at 556, Pg. ID 601.)  Dr. Buckingham noted that a recent MRI was "unchanged from a year ago."  (*Id.*)  Dr. Buckingham again noted Plaintiff's normal gait and "excellent power" in her arms.  (*Id.*)

12

On July 22, 2010, Plaintiff returned to Dr. Siddiqui.  (*Id.* at 565, Pg. ID 610.)
Plaintiff reported that her pain was "10/10."  (*Id.*)  Dr. Siddiqui completed a
questionnaire on which he indicated that Plaintiff could sit for only 15 minutes at
one time and stand for only 15 minutes at one time; would need to take
unscheduled breaks during the workday; must elevate her legs at a 45-degree angle
during prolonged sitting; could never lift less than 10 pounds; could never look
down, turn her head right or left, look up, or hold her head in a static position; and
could never stoop, crouch/squat, or climb stairs.  (*Id.* at 560-563, Pg. ID 605-08.)
Dr. Siddiqui also indicated that Plaintiff would likely be absent from work more
than four days per month due to her impairments.  (*Id.* at 563, Pg. ID 608.)  Dr.
Siddiqui concluded that Plaintiff's "medical condition is non-curable and she is
totally and permanently disabled."  (*Id.* at 565, Pg. ID 610.)

On October 27, 2011, Plaintiff returned to the emergency room complaining
of swelling in her extremities.  (*See id.* at 663, Pg. ID 709.)  A physical exam,
however, revealed only "[m]ild swelling in the left lower extremity."  (*Id.* at 665,
Pg. ID 711.)  Plaintiff's sensation in the lower extremities was "grossly intact" and
her strength was "5 out of 5."  (*Id.*)  The doctor noted that Plaintiff was "able to
ambulate on her heels and toes independently."  (*Id.*)  The doctor found no
tenderness or significant pain or radiculopathy on lateral extension or oblique
extension of Plaintiff's neck.  (*See id.* at 664, Pg. ID 710.)  However, the doctor

13

noted that Plaintiff had positive Tinel's and Phalen's signs in her left wrist. (*See id.* at 663.)

On November 2, 2011, Dr. Siddiqui wrote a letter "To Whom It May Concern" regarding Plaintiff. (*See id.* at 655, Pg. ID 701.) In the letter, Dr. Siddiqui concluded as follows:

> Presently patient is so much crippled because of generalized fatigue, sleep apnea, herniated disc in the neck and lower back, carpal tunnel syndrome, exogenous obesity, gastroesophageal reflux disease, reactive airway disease, and emphysema there is hardly anything she can do. She can move her arm, but she is not able to perform on repeated basis…. Medically she is disabled. There is no way she is going to be cured and the prognosis is extremely poor.

(*Id.* at 656, Pg. ID 702.)

Several weeks later, Plaintiff began seeing a new primary care physician, Dr. Elizabeth Drake ("Dr. Drake"). On physical examination, Dr. Drake found "no evidence of active synovitis involving [Plaintiff's] hands, wrists, knees, or ankles." (*Id.* at 666, Pg. ID 712.) Despite Plaintiff's complaints of left ankle swelling, Dr. Drake found no edema and commented that the swelling "was not particularly prominent." (*Id.*) Dr. Drake also found that Plaintiff had full strength in her upper and lower extremities, only mildly diminished grip strength, and only "mildly positive Phalen's test." (*Id.*) Plaintiff returned to Dr. Drake several weeks later, on November 28, 2011, but Dr. Drake again found no evidence of edema. (*Id.* at 679, Pg. Id 725.)

Upon Dr. Drake's recommendation, Plaintiff returned to Dr. Buckingham. Dr. Buckingham ordered an MRI (the "2011 MRI") and found that Plaintiff's cervical and lumbar spine was "essentially normal." (*See* ECF #11-11 at 891, Pg. ID 939.) Dr. Buckingham noted that the 2011 MRI "really showed no change from the MRI of 2 years ago." (*Id.*) Dr. Buckingham concluded that he "would not recommend surgery" and that "no further neurosurgical intervention is contemplated." (*Id.*) Several weeks later, Dr. Buckingham performed a physical examination of Plaintiff and found that she had normal gait, "good power in her upper extremities," and normal muscle tone. (*Id.* at 893, Pg. ID 941.)

Also upon Dr. Drake's recommendation, Plaintiff made several visits to rheumatologist Dr. Blake Roessler. An EMG study performed on July 6, 2012, showed "mild … mononeruopathy" of the left wrist and "very mild … mononeuropathy" of the right wrist. (*See id.* at 774, Pg. ID 822.) However, there was no evidence of polyneuropathy or myopathy. (*See id.*) Further, Dr. Roessler found that Plaintiff had no edema and full strength in her upper extremities. (*See id.* at 758-59, Pg. ID 806-07.)

Plaintiff visited Dr. Daniel Leung ("Dr. Leung"), a spine specialist, on February 21, 2012. (*See* ECF #11-10 at 699, Pg. ID 746.) On physical examination, Plaintiff had full range of motion in her upper and lower extremities, and she was able to sit and stand with minimal difficulty. (*See id.* at 698, Pg. ID

745.)  Dr. Leung observed that a recent MRI (the "2012 MRI") showed only "minimal mild lumbar spondylosis."  (*Id.* at 699, Pg. ID 746.)  Dr. Leung concluded that he did "not believe that her symptoms are related to her spine from a radiculopathy or myelopathy."  (*Id.*)  Upon Plaintiff's return to Dr. Leung on May 22, 2012, Dr. Leung again found normal physical exam results and concluded that "there is … little else that [he] can offer [Plaintiff]," as her "symptoms are [not] of radicular etiology from her spine." (*See id.* at 755, Pg. ID 802.)  Plaintiff later asked Dr. Leung to complete paperwork for her disability claim, but Dr. Leung declined.  (*See* ECF #11-12 at 926, Pg. ID 975.)

Plaintiff visited another neurologist, Dr. Matthew Lorincz ("Dr. Lorincz"), on July 20, 2012.  (*See id.* at 943, Pg. ID 992.)  Plaintiff complained of burning pain throughout her body and an achy, deep pain in her left leg, left arm, right hip, thigh, and neck.  (*See id.*)  Dr. Lorincz performed a physical examination and noted, *inter alia*, that Plaintiff "has a normal gait for someone of her weight … can walk on heels and toes … has normal tone in all four extremities … [and] has full strength proximally and distally in the upper and lower extremities."  (*Id.* at 944, Pg. ID 993.)  Dr. Lorincz reviewed an EMG dated July 6, 2012 that he concluded "was consistent with left carpal tunnel syndrome" but showed no evidence of neuropathy.  (*Id.*)  Dr. Lorincz concluded that "a large portion of [Plaintiff's] pain is likely related to … central pain syndrome," otherwise known as fibromyalgia.

16

(*Id.*)  Dr. Lorincz recommended increasing Plaintiff's dosage of Cymbalta, stretching and exercising, and wearing a wrist splint.  (*Id.*)  Plaintiff later asked Dr. Lorincz to provide a letter for her disability claim.  (*See id.* at 903, Pg. ID 952.)  Dr. Lorincz told Plaintiff that he could provide a letter that would say that he "believe[s] that [Plaintiff] has a central pain syndrome" and that Plaintiff "indicates that because of her pain, she is unable to work."  (*Id.* at 904, Pg. ID 953.)

Plaintiff returned to Dr. Drake on August 17, 2012.  (*Id.* at 935, Pg. ID 984.)  Plaintiff reported that her symptoms were "somewhat better" due to the Cymbalta and wrist splint.  (*Id.*)  Dr. Drake confirmed Dr. Lorincz's diagnosis of centralized pain syndrome.  (*Id.* at 936, Pg. ID 985.)  On September 10, 2012, Plaintiff asked Dr. Drake to complete paperwork for her disability claim.  (*See id.* at 915, Pg. ID 964.)  Dr. Drake noted as follows: "I have given [Plaintiff] a letter stating her medical diagnosis and that she has been unable to work for three years.  Nonetheless, I will defer recommendations regarding disability to Physical Medicine and Rehabilitation."  (*Id.* at 916, Pg. ID 965.)

## C.   **Vocational Expert's Testimony**

At the Second Hearing, the ALJ heard testimony from vocational expert Lois Brooks ("Brooks").  The ALJ asked Brooks whether a hypothetical person with certain limitations described by Plaintiff would be able to perform Plaintiff's

previous job as a medical biller.[3]   (*See* ECF #11-2 at 71-72, Pg. ID 110-11.)

Brooks testified that such a person would not be able to do Plaintiff's past work.

(*See id.* at 72, Pg. ID 111.)   However, Brooks testified that such a person could

perform some sedentary, unskilled jobs.   (*See id.*)   Specifically, Brooks stated that

such a person could work in an unskilled clerical job (3,000 in southeast Michigan;

6,000 in the entire state), as a visual inspector (1,500 in southeast Michigan; 3,000

in the entire state), or as a packager (1,800 in southeast Michigan; 3,600 in the

entire state).   (*See id.* at 72-73, Pg. ID 111-12.)

**D.   The ALJ's Findings and Relevant Medical Evidence**

In his decision, the ALJ first determined that Plaintiff "has not engaged in

substantial gainful activity since March 20, 2009, the alleged onset date [of

disability]."   (ALJ's Decision at 26, Pg. ID 65.)   The ALJ then concluded at step

two that Plaintiff has a number of "severe impairments" that "have more than a

minimal effect on [Plaintiff's] ability to perform basic work-related activities."

(*Id.*)   The ALJ identified Plaintiff's severe impairments as follows:

> minimal/mild lumbar spondylosis and mild-moderate lumbar facet
> hypertrophy/arthropathy with history of radicular pain; broad
> disc/osteophyte protrusions of the cervical spine from C4-C7, along
> with congenital fusion of the C3-C4 disc space with history of
> radicular pain; fibromyalgia; asthma; morbid obesity; obstructive
> sleep apnea; bilateral carpal tunnel syndrome with history of ganglion
> cyst removals from left and right hands; gastroesophogeal reflux

---

[3]   The limitations in this hypothetical question are substantially the same as the
limitations in Plaintiff's RFC, described in Part D, *infra*.

disease (GERD); history of left renal calculus; asymmetric neuropathy involving the lower extremities related to radicular process around L5-S1; mild right chondromalacia; history of headaches; and depression….

(*Id.*)

In step three of the evaluation process, the ALJ held that none of Plaintiff's impairments, or their combination, "meets or medically equals the severity" of one of the SSA's listed impairments. (*Id.* at 27, Pg. ID 66.) In other words, the ALJ found that Plaintiff was not conclusively presumed disabled.

In step four of the evaluation process, the ALJ conducted a thorough review of Plaintiff's extensive medical records. (*See id.* at 31-40, Pg. ID 70-79.) The ALJ concluded that although Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms," Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not "fully credible." (*Id.* at 40, Pg. ID 79.) The ALJ noted that "[t]here are certainly findings that would support work-related functional limitations," including several MRIs showing "degeneration at multiple levels," such as the March 2009 MRI that Dr. Buckingham described as "quite impressive." (*Id.*) However, the ALJ concluded that "the objective findings on imaging studies and physical examinations do not compel a conclusion that [Plaintiff] is completely precluded from work activity." (*Id.*) The ALJ found that the "abnormal findings … are outweighed by countervailing findings, which occurred fairly consistently over the longitudinal

19

period of alleged disability." (*Id.*) The ALJ cited several "imaging studies of the lumbar spine show[ing] no more than mild degenerative disc disease" and "multiple examinations throughout the alleged period of disability and with a wide range of medical professionals" in which Plaintiff was found "to have full range of motion of the spine and joints." (*Id.*) The ALJ also noted that multiple physicians commented that Plaintiff had excellent strength in her extremities, normal gait, and no difficulty moving from sitting to standing. (*Id.*) Further, the ALJ commented that his own observations of Plaintiff at the Second Hearing "bear negatively on [her] credibility." (*Id.* at 41, Pg. ID 80.) Specifically, the ALJ noted that he observed Plaintiff "walk[ing] with a steady gait while carrying a large, full, hobo-style pocketbook," which she was able to pick up, put down, and "sling … over her shoulder without any apparent difficulty." (*Id.*)

Thus, the ALJ determined that Plaintiff has the RFC to:

lift and/or carry 5 pounds frequently and 10 pounds occasionally; can stand and/or walk with normal breaks for a total of 2 hours in an 8-hour workday, but can do so for only 15 minutes at one time; can sit with normal breaks for a total of 6 hours in an 8-hour workday, but can do so for only 15 minutes at one time; can perform pushing and pulling motions with the upper and lower extremities within the aforementioned weight restrictions for up to 2/3 of the workday; can perform activities requiring bilateral manual dexterity for both gross and fine manipulations with handling and reaching for up to 2/3 of an 8-hour workday' needs to avoid hazards in the workplace such as moving machinery and unprotected heights; needs to avoid vibrations … and can only occasionally climb stairs with handrails, balance, stoop, crouch, kneel, and crawl, but needs to avoid climbing ladders, scaffolds, and ropes.

(*Id.* at 29, Pg. ID 68.)[4]   In light of this RFC, the ALJ found that Plaintiff was unable to perform her past relevant work as a medical biller.  (*Id.* at 45, Pg. ID 84.)

Finally, in step five of the evaluation process, the ALJ determined that "[c]onsidering [Plaintiff's] age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform…." (*Id.* at 46, Pg. ID 85.)   In this stage, the ALJ credited the vocational expert's testimony that a hypothetical person with Plaintiff's limitations would be able to perform the requirements of representative occupations such as clerical jobs, visual inspection, and packager.  (*See id.*)   The ALJ therefore concluded that Plaintiff "has not been under a disability, as defined in the [Act]…" (*Id.* at 47, Pg. ID 86.)

## ANALYSIS

Plaintiff argues that the ALJ's Decision is flawed in four ways.  For the reasons explained below, the Court does not find any of Plaintiff's arguments persuasive.

---

[4]   The ALJ incorporated additional limitations into Plaintiff's RFC related to Plaintiff's mental impairments.   Because Plaintiff does not raise claims with respect to her mental impairments in this action, this Opinion generally does not address these limitations or Plaintiff's mental health history.

**A.     The ALJ's Determination of Plaintiff's Credibility Was Supported by Substantial Evidence**

Plaintiff first challenges the ALJ's finding that her testimony was not fully credible.   Plaintiff argues that the ALJ's determination of her credibility was flawed because the ALJ "reli[ed] on medical test results generated long before the [alleged disability] onset date."  (Pla.'s Mot. at 11, Pg. ID 1271.)   Specifically, Plaintiff asserts that the ALJ erred when he cited an April 25, 2008, EMG (the "2008 EMG") that showed "no radicular symptoms" as evidence that Plaintiff was not completely precluded from work activity.  (*See id.*; *see also* ALJ's Decision at 40, Pg. ID 79.)  Plaintiff argues that the 2008 EMG is not relevant to her disability application because her alleged onset date was March 20, 2009.  (*See* Pla.'s Mot. at 11, Pg. ID 1271.)  The Commissioner contends that the ALJ's citation to the EMG was not error because, pursuant to Social Security regulations, "evidence from the twelve-month period prior to Plaintiff's alleged onset of disability was relevant to the ALJ's determination of whether her impairments were disabling during the period at issue." (Commissioner's Mot. at 5, Pg. ID 1295.)

Plaintiff's argument is not persuasive because the 2008 EMG was just one of many test results and physician's opinions that the ALJ cited in concluding that Plaintiff was not entirely credible.   "[E]ven if an ALJ's adverse credibility determination is based partially on invalid reasons, harmless error analysis applies to the determination, and the ALJ's decision will be upheld as long as substantial

22

evidence remains to support it." *Johnson v. Comm'r of Soc. Sec.*, 535, Fed. App'x 498, 507 (6th Cir. 2013) (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012)).  In this case, the ALJ found Plaintiff not entirely credible due to, *inter alia*, imaging studies that showed "no more than mild degenerative disc disease;" multiple medical examinations finding Plaintiff to have full range of motion and excellent strength; medical opinions noting absence of edema, despite Plaintiff's complaints of swelling; and several physician's comments that Plaintiff had no apparent difficulty walking or moving from a sitting to standing position. (*See* ALJ's Decision at 40, Pg. ID 79.)  These test results and physical examinations spanned nearly the entire duration of Plaintiff's alleged disability. Thus, even if the 2008 EMG was not relevant to Plaintiff's disability claim, the ALJ nonetheless cited substantial evidence that Plaintiff's statements regarding her symptoms were not fully credible.

Plaintiff also argues that the ALJ's credibility determination was flawed because the ALJ failed to consider test results favorable to her.  Specifically, Plaintiff claims that the ALJ did not address (1) the 2009 EMG, which showed "evidence of mild C6-C7 radiculopathy involving the bilateral upper extremities ... [and] mild sensory carpal tunnel syndrome in both wrists" and (2) the 2012 MRI, which showed "minimal to mild lumbar spondylosis."  (Pla.'s Mot. at 11-12, Pg. ID 1271-72.)  However, the ALJ *did* consider each of these imaging studies.

Indeed, the ALJ specifically cited Dr. Buckingham's interpretation of the 2009 EMG in noting that Plaintiff's record did support some functional limitations.  (*See* ALJ's Decision at 40, Pg. ID 79.)  Additionally, the ALJ cited the 2012 MRI to support his conclusion that "imaging studies … showed no more than mild degenerative disc disease." (*Id.*)  Plaintiff's argument is therefore without merit.

Next, Plaintiff argues that the ALJ erred by citing the June 2009 MRI "as evidence that she is not disabled."  (Pla.'s Mot. at 12, Pg. ID 1272.)  Plaintiff asserts that the June 2009 MRI showed "mild degenerative disc disease" and that "this is not a normal imaging result and cannot be logically construed as evidence of good health." (*Id.*)  This argument misstates the ALJ's conclusions.  The ALJ did *not* assert that the June 2009 MRI indicated that Plaintiff was in good health.  Rather, the ALJ cited the study to support his conclusion that Plaintiff's degenerative disc disease was "no more than mild" and, therefore, was not consistent with the severe limitations that Plaintiff claimed.  (*See* ALJ's Decision at 40, Pg. ID 79.)  Thus, the ALJ correctly determined that the "mild" impairment noted in the June 2009 MRI undermined Plaintiff's credibility as to the severity of her symptoms.

Finally, Plaintiff contends that the ALJ erred by improperly "downplay[ing] the significance" of the March 2009 MRI and the 2011 MRI.  (Pla.'s Mot. at 13, Pg. ID 1273.)   The ALJ committed no such error.   Indeed, although Dr.

Buckingham concluded that the March 2009 MRI was "quite impressive," he also commented that Plaintiff had "excellent power" in her upper extremities and normal gait.  (*See* at ECF #11-7 at 443, Pg. ID 487.)  Thus, the ALJ concluded that "although the claimant had significant abnormalities of her cervical spine on imaging studies, they did not substantially interfere with her functional abilities with respect to strength or ambulation."[5]  (ALJ's Decision at 41, Pg. ID 80.)  Further, Dr. Buckingham reviewed the 2011 MRI and found that the spinal condition had not deteriorated over time, and Dr. Buckingham's treatment notes from 2011 indicate that Plaintiff retained good power in her upper extremities and normal gait.  (*See* ECF #11-11 at 891-93, Pg. ID 939-41.)  Thus, Dr. Buckingham's opinions contained substantial evidence that, despite Plaintiff's spinal abnormalities, her functioning was not meaningfully limited.  Accordingly, Plaintiff simply has not shown that the ALJ erred in evaluating either the March 2009 or 2011 MRIs.

---

[5]  Plaintiff argues that this conclusion was an "improper medical determination[]" by the ALJ.  (*See* Pla.'s Mot. at 16, Pg. ID 1276.)  However, the ALJ's consideration of Dr. Buckingham's physical examination findings was not improper.  Indeed, the ALJ's determination that Plaintiff's anatomical abnormalities did not significantly interfere with her functional abilities was a reasonable inference given that Dr. Buckingham's physical examination findings were essentially normal.  Where, as here, the ALJ "properly reviewed and weighed" the medical evidence "to make a legal determination that is supported by substantial evidence, the assertion that the ALJ was 'playing doctor' is unsupported."  *Griffith v. Comm'r of Soc. Sec.*, --- Fed. App'x ---, 2014 WL 3882671, at *6 (6th Cir. Aug. 7, 2014).

25

**B.      Opinions of Drs. Siddiqui and Drake**

Next, Plaintiff argues that the ALJ erred by failing to accord proper weight to the medical opinions of Drs. Siddiqui and Drake.  (*See* Pla.'s Mot. at 13, Pg. ID 1273.)  An ALJ must grant "controlling weight" to the opinion of a claimant's treating physician where "(1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) the opinion is not inconsistent with the other substantial evidence in the case record."  *Gayheart v. Comm'r*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 CFR 404.1527(c)(2)) (internal punctuation omitted).  If the opinion of a treating physician is not entitled to controlling weight, then the ALJ must provide "good reasons" for according the opinion less than controlling weight.  *Id.* at 376 (citing 20 CFR 404.1527(c)(2)).  "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.* (quoting Soc. Sec. Rul. No. 96-2p).

**1.  Dr. Siddiqui's Opinion**

In reaching his conclusions, the ALJ accorded only "limited weight" to Dr. Siddiqui's opinions.  (ALJ's Decision at 44, Pg. ID 83.)  The ALJ noted that Dr. Siddiqui's statements that Plaintiff was conclusively disabled and/or unable to work were not entitled to controlling weight because such statements "are not

26

medical opinions" but rather "are administrative findings dispositive of a case" that are "reserved to the Commissioner." (*Id.*) In addition, the ALJ determined that the "extreme limitations" Dr. Siddiqui found "are not reasonably supported by his own examinations," as "his progress notes contain little in the way of objective findings." (*Id.* at 44, Pg. ID 83.) Further, the ALJ noted that "the findings of other doctors including Dr. Buckingham, Dr. Drake, Dr. Lorincz, and Dr. Leung are not so significant that they would justify Dr. Siddiqui's limitations," as those doctors "frequently found [Plaintiff] to have full strength, normal gait, limited edema, and preserved range of motion." (*Id.*)

Plaintiff argues that the ALJ did not provide good reasons for according only limited weight to Dr. Siddiqui's opinion regarding the nature and severity of her impairments.[6] (*See* Pla.'s Mot. at 14, Pg. ID 1274.) Plaintiff contends that "Dr. Siddiqui's opinion that [Plaintiff's] symptoms are valid, cause her suffering[,] and merit treatment is consistent with" the opinions of her other doctors. (*Id.*) Further, citing *Hensley v. Astrue*, 573 F.3d 263 (6th Cir. 2009), Plaintiff argues that even if Dr. Siddiqui's opinion conflicted with another doctor's opinion, Dr. Siddiqui's opinion "cannot be discredited for this reason alone." (*Id.*)

---

[6] Plaintiff appears to concede that the ALJ properly gave only limited weight to Dr. Siddiqui's conclusions as to the ultimate issue of disability (e.g., his statement that Plaintiff was "totally disabled"). (*See* Pla.'s Mot. at 14, Pg. ID 1274.)

Plaintiff's arguments are without merit.  The ALJ correctly found that Dr. Siddiqui's opinions are not entitled to controlling weight because they are largely inconsistent with the opinions and objective medical findings of other doctors who treated Plaintiff.  For instance, Dr. Siddiqui's findings that Plaintiff cannot walk, bend, or turn her head are expressly contradicted by evidence from her other physicians.  Indeed, other physicians reported, *inter alia*, that Plaintiff had normal gait (*see, e.g.*, ECF #11-7 at 443, Pg. ID 487; *see also* ECF #11-12 at 944, Pg. ID 993), only mildly limited range of motion in her back (*see* ECF #11-12 at 926, Pg. ID 925), no limitation in range of motion in her neck (*see, e.g.*, ECF #11-8 at 529, Pg. ID 574; *see also id.* at 464, Pg. ID 509), and was able to perform a deep knee bend (*see* ECF #11-11 at 774, Pg. ID 822).  Because Dr. Siddiqui's opinions as to the nature and severity of Plaintiff's impairments are inconsistent with substantial evidence in the case record, Dr. Siddiqui's opinions are not entitled to controlling weight.  *See Gayheart*, 710 F.3d at 376.

Moreover, contrary to Plaintiff's allegations, the ALJ did not discount Dr. Siddiqui's opinions solely because they conflicted with those of Plaintiff's other doctors.  In fact, the ALJ specifically stated that Dr. Siddiqui's opinions were not entitled to controlling weight because they "are not reasonably supported by his own examinations" and "contain little in the way of objective findings such as quantified strength deficits, range of motion limitations, or other abnormalities."

28

(*Id.* at 44, Pg. ID 83.)  Thus, the ALJ did not err by according only limited weight to Dr. Siddiqui's opinions.

### 2.  Dr. Drake's Opinion

The ALJ cited several reasons that Dr. Drake's opinions were entitled to only limited weight.  (*See id.* at 45, Pg. ID 84.)  First, the ALJ found that Dr. Drake's statement that Plaintiff had been "unable to work for three years" to be an "ultimate finding on [an] issue[] reserved to the Commissioner." (*Id.*)  The ALJ also noted that "it is unlikely that Dr. Drake could reliably estimate [Plaintiff's] suitability for work dating as far back as 2009 considering that she did not first see [Plaintiff] until late 2011." (*Id.*)  Moreover, the ALJ found that Dr. Drake's findings did not support a conclusion that Plaintiff had been disabled during the time that Dr. Drake treated her.  (*See id.*)  To the contrary, the ALJ noted that Dr. Drake "found that the swelling [Plaintiff] complained of was not particularly prominent on at least two different examinations" and that Plaintiff "had full strength of the upper and lower extremities and only mildly reduced … grip strength." (*Id.*)  The ALJ also noted that Plaintiff's other doctors made similar findings. (*See id.*)  Finally, the ALJ pointed out that at Plaintiff's most recent visit with Dr. Drake, Plaintiff had reported that her pain had improved with Cymbalta and wrist splints, and that the reported improvement was inconsistent with Dr. Drake's opinion that Plaintiff was disabled.  (*See id.*)

Plaintiff argues that even if Dr. Drake was not qualified to opine on Plaintiff's health from 2009 until 2011 (i.e., before their treatment relationship began), the ALJ erroneously discredited Dr. Drake's opinion that Plaintiff had been unable to work after 2011. (*See* Pla.'s Reply, ECF #19 at 5, Pg. ID 1318.) Further, Plaintiff argues that the ALJ erred by not according controlling weight to Dr. Drake's opinions because Dr. Drake's diagnosis of central pain syndrome is consistent with other doctors' opinions. (*See* Pla.'s Mot. at 15, Pg. ID 1275.) Finally, Plaintiff argues that it was error for the ALJ to rely on Plaintiff's reported improvement because the record indicates that Plaintiff told Dr. Drake that she was still in pain. (*See id.* at 15-16, Pg. ID 1275-76.)

Again, Plaintiff's arguments are unpersuasive. As an initial matter, it is not clear that Dr. Drake intended her statement that Plaintiff "has been unable to work for three years" to be interpreted as a medical opinion of Plaintiff's disability. To the contrary, Dr. Drake may simply have been describing that Plaintiff had *reported* that she had been unable to work during that time. This interpretation of Dr. Drake's statement is supported by the fact that (1) Dr. Drake did not treat Plaintiff during two of the three years in question, and (2) Dr. Drake expressly declined to make any "recommendations regarding disability." (ECF #11-12 at 916, Pg. ID 965.) Moreover, even if Dr. Drake did intend her statement to be a medical opinion of Plaintiff's disability, that opinion is not entitled to controlling

30

weight because it "invade[s] the ultimate disability issue reserved to the Commissioner." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 727 (6th Cir. 2014).

In addition, the ALJ correctly noted that Dr. Drake's objective findings do not support a conclusion that Plaintiff is disabled. Although Dr. Drake diagnosed Plaintiff with central pain syndrome, Dr. Drake did not find that Plaintiff's limitations were as severe as Plaintiff reported. Indeed, upon physical examination Dr. Drake found significantly less swelling than Plaintiff reported and full or nearly-full strength in Plaintiff's extremities. For all of these reasons, the ALJ correctly determined that Dr. Drake's opinions were entitled to only limited weight.

## C.    The ALJ Did Not Make An Improper Medical Determination

Next, Plaintiff argues that the ALJ made an "improper medical determination[]" when he relied on his observations of Plaintiff at the Second Hearing, including the fact that she entered the room "with a steady gait" and carrying a large pocketbook "without any apparent difficulty." (Pla.'s Mot. at 16, Pg. ID 1276; ALJ's Decision at 41, Pg. ID 80.) However, an ALJ is expressly permitted to take into account his own observations at an in-person hearing as part of his evaluation of a claimant's credibility. *See* SSR 96-7p ("In instances where the individual attends an administrative proceeding conducted by the adjudicator,

the adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements").   Thus, the ALJ's consideration of his observations of Plaintiff – which he gave "much less weight than the objective findings in the medical records" – was not improper.  (ALJ's Decision at 41, Pg. ID 80.)[7]

### D. The ALJ Did Not Err in Formulating Plaintiff's RFC or Hypothetical Questions for the Vocational Expert

Finally, Plaintiff argues that the ALJ failed to incorporate the limiting effects of her fibromyalgia into hypothetical questions posed to vocational expert Brooks and, ultimately, Plaintiff's RFC.   (*See* Pla.'s Mot. at 17-18, Pg. ID 1277-78.) Although Plaintiff's Motion does not identify any specific errors in the hypothetical questions or RFC, Plaintiff argues in her Reply Brief that the ALJ erroneously concluded that she could perform pushing and pulling motions with her upper and lower extremities for up to two-thirds of a workday and could perform activities requiring bilateral manual dexterity for both gross and fine manipulation with handling and reaching up to two-thirds of a workday.  (*See* Pla.'s Reply at 7, Pg. ID 1320.)

---

[7]  In addition, as discussed above and contrary to Plaintiff's allegations, the ALJ did not make an improper medical determination when he interpreted Dr. Buckingham's evaluation of Plaintiff's MRIs.

Plaintiff has not demonstrated that the ALJ omitted any relevant limitations from the hypothetical questions or her RFC; nor has she shown that the ALJ erred by concluding that she could perform the aforementioned activities.  In questioning a vocational expert and formulating an RFC, an ALJ "is only required to incorporate … those limitations that have [properly] been accepted as credible," *McIlroy v. Comm'r of Soc. Sec.*, 42 Fed. App'x 738, 739 (6th Cir. 2002); *see also Keeton v. Comm'r of Soc. Sec.*, --- Fed. App'x ---, 2014 WL 5151626, at *16-17 (6th Cir. Oct. 14, 2014).  In this case, although the ALJ concluded that Plaintiff's fibromyalgia constituted a "severe impairment" (ALJ's Decision at 26, Pg. ID 65), he also found that Plaintiff's statements "concerning the intensity, persistence and limiting effects" of her symptoms were "not credible to the extent that they are inconsistent" with her RFC (*id.* at 40, Pg. ID 79).  The ALJ concluded that Plaintiff could perform the pushing, pulling, and manual dexterity activities discussed above (subject to a 5-10 pound weight restriction) in light of the "multiple physical examinations [that] revealed full grip strength" and "Tinel's/Phalen's testing [that was] not uniformly positive."  (*Id.*)  Thus, the ALJ's hypothetical questions and RFC properly reflected Plaintiff's limitations that he found to be credible.

In sum, the ALJ reasonably concluded that the medical evidence did not warrant including more significant limitations on pushing, pulling, manual dexterity, or any other activities.   Accordingly, the ALJ's formulation of hypothetical questions and Plaintiff's RFC was not in error.

## **CONCLUSION**

For the reasons stated above, the Court **GRANTS** Defendant's Motion for Summary Judgment (ECF #18) and **DENIES** Plaintiff's Motion for Summary Judgment (ECF #15).

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  November 6, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 6, 2014, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113